Jeffrey D. Kaliel (SBN 238293)
jkaliel@kalielpllc. com
KALIELGOLD PLLC
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Tel: (202) 350-4783

Sophia Goren Gold (SBN 307971)
sgold@kalielgold.com
KALIELGOLD PLLC
950 Gilman Street, Suite 200
Berkeley, California 94710
Tel: (202) 350-4783

Attorneys for Plaintiff and the Proposed Class

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAKE CAVANAUGH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FANATICS, LLC<br><br>Defendant. | CASE NO. 1:22-cv-01085-JLT-SAB<br><br>Hon. Jennifer L. Thurston<br><br>**PLAINTIFF JAKE CAVANAUGH'S MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY ACTION**<br><br>Hearing: November 28, 2022<br>Time: 9:00 a.m.<br>Courtroom: 4<br><br>Judge: Hon. Jennifer L. Thurston |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. THE UNDERLYING DISPUTE ..... 1

III. LEGAL STANDARD ..... 2

A. Defendant Bears the Burden of Proving an Enforceable Agreement to Arbitrate ..... 2

B. The Issue of Whether an Agreement to Arbitrate Exists is For the Court to Decide ..... 3

IV. DEFENDANT'S MOTION TO COMPEL ARBITRATION MUST BE DENIED ..... 4

A. No Agreement to Arbitrate Was Formed Between the Parties Because Plaintiff Was Not on Reasonable Notice of Fanatics' Terms and Did Not Assent to Those Terms ..... 4

1. Fanatics' Account Creation and Checkout Screens Fail to Provide Sufficient Notice of the Arbitration Agreement to Plaintiff ..... 4

a. Defendant's Hyperlink and Disclosure Are Not Reasonably Conspicuous ..... 9

b. Defendant's Cases Are Inapposite ..... 18

2. Publishing the TOU to the Fanatics' Website Does Not Constitute Reasonable Notice ..... 18

3. Plaintiff Did Not Assent to the Terms of the Arbitration Agreement By Continuing to Make Purchases on Fanatics' Website ..... 19

B. Equitable Estoppel Principles Do Not Apply ..... 19

V. CONCLUSION ..... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ahlstrom v. DHI Mortgage Company, Ltd., L.P.*, 21 F.4th 631 (9th Cir. 2021) ....................2, 3

*Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 458 (S.D.N.Y. 2017)....................10

*Application of Equitable Estoppel to Compel Arbitration By or Against Nonsignatory—State Cases*, 22 A.L.R. 6th 387 (2007)....................20

*AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986)....................2

*Belyea v. GreenSky, Inc.*, 2020 WL 3618959 (N.D. Cal. July 2, 2020)....................4

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) ....................10, 15, 16

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ....................1, 3, 5, 9, 10, 12, 17, 19

*Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ....................4

*Brooks v. IT Works Marketing, Inc.*, 2022 WL 2079747 (E.D. Cal. June 9, 2022), ....................3, 9

*Bucher v. All. Title Co., Inc.*, 127 Cal. App. 4th 262 (2005) ....................20

*Camping Const. Co. v. District Council of Iron Workers*, 915 F.2d 1333 (9th Cir. 1990) ....................2

*Carwile v. Samsung Telecommunications America, LLC*, 2013 WL 11030374 (C.D. Cal. July 9, 2013)....................20

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 56 (1st Cir. 2018)....................10, 19

*Dohrmann v. Intuit, Inc.*, 823 Fed. Appx. 482 (9th Cir. 2020)....................18

*Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240 (N.D. Cal. 2019) ....................4

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995)....................2, 3

*Franklin v. Community Regional Medical Center*,
2019 WL 6701298 (E.D. Cal. Dec. 9, 2019) .......... 20

*JSM Tuscany, LLC v. Super. Ct.*,
193 Cal. App. 4th 1222 (Cal. Ct. App. 2011) .......... 20

*Kauders v. Uber Technologies, Inc.*,
486 Mass. 557 (2021) .......... 17, 19

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*,
845 F.3D 979 (9th Cir. 2017) .......... 3

*Lee v. Ticketmaster L.L.C.*,
817 Fed. Appx. 393 (9th Cir. 2020) .......... 18

*Long v. Provide Commerce, Inc.*,
245 Cal. App. 4th 855 (Cal. Ct. App. 2016) .......... 9

*Monster Energy Co. v. Schechter*,
7 Cal. 5th 781 (2019) .......... 3

*Montoya v. Comcast Corp.*
2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) .......... 20

*Najah Edmundson v. Klarna, Inc.*,
No. 3:21-CV-00758 (SVN), Dkt. No. 31 (D. Conn. February 15, 2022) .......... 9

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 17, 19, 21

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .......... 5, 9, 14

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) .......... 18

*Pizarro v. QuinStreet, Inc.*,
2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) .......... 18

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) .......... 19

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .......... 9, 13, 14

*Sgouros v. Transunion Corp.*,
817 F.3d 1029 (7th Cir. 2016) .......... 17

*Snow v. Eventbrite, Inc.*
No. 3:20-CV-03698-WHO, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) .......... 7

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) .......... 5

*Stafford v. Rite Aid Corporation*,
998 F.3d 862 (9th Cir. 2021) .......... 20

*Stiner v. Brookdale Senior Living, Inc.*,
810 Fed. Appx. 531 (9th Cir. 2020) .......... 20

*Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020) .......... 3

*Theodore v. Uber Technologies, Inc.*,
442 F. Supp. 3d 433 (D. Mass. 2020) .......... 9

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
925 F.2d 1136 (9th Cir. 1991) .......... 3

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989) .......... 2

*Wilson v. Redbox Automated Retail, LLC*,
448 F. Supp. 3d 873 (N.D. Ill. 2020) .......... 10

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......... 2

Cal. Civ. Code § 1750 .......... 2

## I. INTRODUCTION

Defendant Fanatics, LLC ("Defendant" or "Fanatics"), as the party moving to compel arbitration of Plaintiff Jake Cavanaugh's ("Plaintiff") claims, bears the burden to prove that a valid agreement to arbitrate was formed between the Parties. Without submitting any evidence that Plaintiff had actual notice of Fanatics' Terms of Use ("TOU") and corresponding Arbitration Agreement, Defendant argues that Plaintiff nevertheless agreed to waive his right to litigate these claims on a class-wide basis simply by creating an account and making purchases on Fanatics' website. And in the absence of evidence that Plaintiff was aware of arbitration, Defendant must establish, by a preponderance of the evidence, that Fanatics' terms were clear and conspicuous enough to put a reasonable user on constructive notice that he would be bound by those terms.

However, Fanatics' account creation and checkout webpage—containing inconspicuous hyperlinks in miniscule font size and indistinguishable style on a cluttered webpage, distracting users from the relevant terms—are insufficient to place Plaintiff on notice of Defendant's Arbitration Agreement. Indeed, courts throughout the country, including the Ninth Circuit, have routinely held that webpage features and designs presented in a manner like Fanatics' are insufficient to bind users to arbitration. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Put plainly, where Plaintiff was ineffectively placed on notice of Fanatics' TOU, he could not have assented thereto. Because no agreement to arbitrate was formed between the Parties, Defendant's Motion to Compel Arbitration must be denied.

## II. THE UNDERLYING DISPUTE

Plaintiff challenges Fanatics' deceptive practice of tacking on a hidden shipping fee of $1.99 on all orders placed on Defendant's sports merchandise website through the assessment of a "Handling Fee," resulting in a much higher shipping cost than was advertised to consumers. Defendant's motivation to conceal the true cost of shipping is clear: by advertising low-cost or "FREE SHIPPING," consumers are more likely to purchase products from Defendant, as opposed to choosing from the myriad of other competitors who fairly disclose their true shipping charges. Plaintiff alleges that Fanatics' "Handling Fee" is deceptive on several grounds: (1) Defendant fails to disclose the added fee until the very last step in a multi-step ordering process; (2) the fee itself is deceptively named and described because it misrepresents it as a pass-through charge for packing and warehouse costs, when the $1.99 far exceeds Fanatics' per-

order packing and warehouse-related costs; and (3) the fee is in actuality, a hidden shipping fee because "handling" is an inextricable part of "shipping." As a result of Defendant's deceptive business practices, Plaintiff brings a putative class action on behalf of himself and a California class of similarly situated consumers, alleging violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; and for breach of contract.

## III. LEGAL STANDARD

### A. Defendant Bears the Burden of Proving an Enforceable Agreement to Arbitrate

The United States Supreme Court recently held that the Federal Arbitration Act (the "FAA") prohibits courts from adopting any "special, arbitration-preferring procedural rules" that "tilt the playing field in favor of (or against) arbitration." *Morgan v. Sundance, Inc.*, 142 S.Ct. 1708, 1713-14 (2022). This new precedent is significant because it supersedes prior case law suggesting that there is a liberal policy in favor of arbitration, or that the FAA requires the court to construe contracts in favor of arbitration. Rather, this Court must consider the arbitration clause just as it would consider any other contract term. *Id.* at 1713 ("Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation.").

Indeed, the FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989); *see also AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (stating "a party cannot be required to submit to arbitration any dispute which he or she has not agreed to submit."). "The cardinal precept of arbitration is that it is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Ahlstrom v. DHI Mortgage Company, Ltd., L.P.*, 21 F.4th 631, 634 (9th Cir. 2021).

Accordingly, the Court must first "determine whether a contract *ever* existed; unless that issue is decided in favor of the party seeking arbitration, there is no basis for submitting any question to an arbitrator." *Camping Const. Co. v. District Council of Iron Workers*, 915 F.2d 1333, 1340 (9th Cir. 1990). To determine whether a valid agreement to arbitrate exists, federal courts generally "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S.

938, 944 (1995). Here, the contract formation analysis under California law requires a manifestation of mutual assent between the parties as to the terms of the agreement. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." *Brooks v. IT Works Marketing, Inc.*, 2022 WL 2079747, at *4 (E.D. Cal. June 9, 2022), citing *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019).

Fanatics, as the party moving to compel arbitration, bears the burden of proving that an agreement to arbitrate exists by a preponderance of the evidence. *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020). As demonstrated below, Fanatics has failed to make this showing.

### B. <u>The Issue of Whether an Agreement to Arbitrate Exists Is For the Court to Decide</u>

There is a strong and long-standing presumption that courts, not arbitrators, determine threshold questions of arbitrability. *First Options*, 514 U.S. at 944-45. Indeed, it is well-established in the Ninth Circuit that challenges to "the very existence of an agreement to arbitrate" must be addressed by the court, not the arbitrator, because if "no agreement to arbitrate was formed, then there is no basis upon which to compel arbitration." *Ahlstrom*, 21 F.4th at 635; *see also Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3D 979, 983 (9th Cir. 2017) ("Although challenges to the validity of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very existence of the contract are, in general, properly directed to the court."); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) ("[A] party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the *existence* of an agreement to arbitrate. Only a court can make that decision.").

Although Defendant contends that the language "any and all disputes, claims and causes of action . . . shall be resolved exclusively by binding arbitration" delegates "scope and enforceability issues to the arbitrator [,]" delegation clauses will not be enforced when where the threshold challenge is whether a valid agreement was ever formed between the parties in the first place. *See Brooks*, 2022 WL 2079747, at *5 ("Although defendants' might be correct that the Terms of Use at issue in this case delegate decisions regarding its interpretation, applicability, or enforceability to an arbitrator…the fundamental issue of

whether a contract (which contained an arbitration provision) was ever formed is for the court to determine."). Because Plaintiff contests only the existence of an agreement to arbitrate, that is a question this Court, and not the arbitrator, must answer. *See also Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019) ("The issue of contract formation, however, is not a delegable gateway issue. The fundamental threshold question of whether there exists a binding contract (of which an arbitration clause is a part) cannot be delegated because it cannot be assumed that a delegation clause contained therein must be given effect. In other words, if a contract contains a delegation clause, that delegation clause may be given effect only where the contract has been formed in the first instance.").[1]

Thus, regardless of what Defendant's delegation clause purportedly states, it is well-established in this Circuit that the question of whether an enforceable agreement to arbitrate exists in the first place cannot be delegated and must be decided by this Court.

## IV. DEFENDANT'S MOTION TO COMPEL ARBITRATION MUST BE DENIED

### A. No Agreement to Arbitrate Was Formed Between the Parties Because Plaintiff Was Not on Reasonable Notice of Fanatics' Terms and Did Not Assent to Those Terms

Plaintiff's claims cannot be compelled to arbitration because no binding agreement to arbitrate exists between the parties. Indeed, there is no evidence that Plaintiff was aware of Fanatics' TOU and corresponding Arbitration Agreement, and Defendant offers none. Further, given the insufficient form of notice Fanatics chose to utilize on its website, Plaintiff could not have been put on constructive notice, either. And where Plaintiff had no actual, nor constructive notice of arbitration, he could not have assented thereto. Accordingly, Plaintiff's claims can only be litigated in this Court.

#### 1. Fanatics' Account Creation and Checkout Screens Fail to Provide Sufficient Notice of the Arbitration Agreement to Plaintiff

[1] Nor does Defendant's incorporation of the AAA rules change the fact that only the Court can determine the threshold issue of whether an agreement to arbitrate was formed. (Mot. at 13.) *See Belyea v. GreenSky, Inc.*, 2020 WL 3618959, *4 (N.D. Cal. July 2, 2020) (rejecting defendant's argument that the arbitration clause's incorporation of the JAMS and AAA rules supports delegation to the arbitrator where there is a challenge to the existence of an enforceable agreement to arbitrate in the first place and distinguishing *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) on that basis).

In the Ninth Circuit, a finding of assent requires that the offeree had either actual or constructive notice of the terms to be bound. *Berman*, 30 F.4th at 856. California's contract formation principles "apply with equal force to contracts formed online[,]" such as the agreement employed by Fanatics. *Id.* at 855-56. Regardless of the various categories of web-based contracts—from clickwrap to browsewrap, and even some combination of the two—the touchstone rules for analyzing contract formation over the Internet are uniform:

> Unless the website operator can show that a consumer had actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman*, 30 F.4th at 856. In assessing the conspicuousness of terms, courts will consider how crowded a webpage is with extraneous information and whether the terms were set off from the surrounding text by distinctive characteristics such as colors, fonts, sizes, and emphasis. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236-37 (2d Cir. 2016). Indeed, online contracts require "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers…if electronic bargaining is to have integrity and credibility." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002).

Here, Plaintiff lacked *both* actual and constructive notice of Fanatics' TOU. Defendant makes no effort to show that Plaintiff had actual notice of the TOU and corresponding Arbitration Agreement. Indeed, Defendant does not argue that Plaintiff ever viewed Fanatics' TOU, let alone the corresponding hyperlinks, that would bind him to Defendant's Arbitration Agreement. Instead, Fanatics argues that Plaintiff was first put on inquiry notice when he created his Fanatics account and then again when he made six separate purchases almost two years after creating his account.

But Fanatics' account creation and checkout processes fail to provide sufficient notice of the Arbitration Agreement to Plaintiff and other consumers. Defendant never requires users to affirmatively click a box to indicate that they reviewed Fanatics' TOU before creating an account or before making a purchase. Nor does Fanatics require users to click the hyperlink TOU before proceeding with account creation or purchase transactions. Moreover, the screens do not constitute sufficient notice of Fanatics'

Arbitration Agreement because the TOU hyperlinks were inconspicuous, hidden amongst a cluttered checkout screen, and otherwise fail to put Plaintiff on reasonable notice of the existence of such TOU, thereby foreclosing his assent to the TOU simply by creating an account or making a purchase. For illustrative purposes, a screenshot of Fanatics' account creation and checkout screens are taken directly from the Flinchbaugh Declaration submitted by Defendant and incorporated in the brief below:




The "Account Creation" screen, Flinchbaugh Decl., ¶ 16.

In viewing Defendant's Account Creation screen, Fanatics' TOU hyperlink is in miniscule text size and in black, non-bolded font. The hyperlink and preceding disclaimer are not in all capital letters, nor are they in any distinguishable font size or style to sufficiently set them apart from the rest of the text on the screen. Indeed, the non-distinguishing text is particularly problematic given the prominence of the large, red "Create an Account" button located above, which is the obvious focal point of the screen. Any reasonable consumer presented with this screen would easily overlook the inconspicuous hyperlink TOU.

There is also a question as to whether this screenshot was the only webpage that Plaintiff would have seen at account creation. Defendant attests that five of Plaintiff's alleged purchases made from September 16, 2021 onward were made with his Fanatics FanCash Rewards discounts, a program which allow customers to apply a discount "on *future* purchases." Flinchbaugh Decl., ¶ 7 (emphasis added). This presumes that Plaintiff signed up for the FanCash discount program on the day he originally created his

Fanatics account, June 6, 2019. *See id.*, ¶ 6. But the Account Creation screen submitted by Defendant above does not reflect that there was any option for a user to sign up for the Fanatics' FanCash program on that screen. Stated another way, it is unclear from just viewing the Account Creation screen to ascertain how or when Plaintiff joined the Fanatics FanCash program because there is no indication on the Account Creation screen that a user may sign up for that program at the same time he creates his Fanatics account, such as by checking a box indicating that the user also wishes to sign up for the FanCash program. This begs the questions whether Plaintiff viewed a *different* screen, or maybe there were *more* screens that Plaintiff encountered when he created his Fanatics account? Either way, the Flinchbaugh Declaration does not explain how a user signs up for the FanCash program or otherwise clarify this point. This uncertainty alone as to what Plaintiff actually saw when he created his account creates a question of fact that calls for denial of Defendant's motion. *See Snow v. Eventbrite*, *Inc.* No. 3:20-CV-03698-WHO, 2020 WL 6135990, at *1 (N.D. Cal. Oct. 19, 2020) (denying defendant's motion to compel arbitration on the grounds that it could not meet its burden that the plaintiffs assented to the terms of service where it failed to establish a clear chain of evidence showing the exact interface plaintiff saw).

Nor was Plaintiff put on reasonable notice of the Fanatics' TOU when he completed his purchases on Fanatics' website. A screenshot of Fanatics' relevant checkout screen is taken directly from Exhibit 1 pg. 3 of the Flinchbaugh Declaration submitted by Defendant and incorporated below:




The "Checkout" screen, Flinchbaugh Decl., Ex. 1 at 3.

In viewing the Checkout screen above, Fanatics' TOU hyperlink is indistinguishable from the surrounding text on the page, as it is indisputably one of the smallest texts on the screen and in non-bolded font. The preceding disclaimer is similarly in miniscule, non-bolded, black font. The fact that the TOU hyperlink is blue in color ultimately fails to distinguish itself from the surrounding text, as there are several other items and text in varying colors across the screen, including the blue PayPal, Venmo, FanCash Rewards, and Visa logos, as well as the "Learn More" hyperlink. Further, the hyperlink and disclaimer are discreetly located almost at the very bottom of the screen and are otherwise lost amongst the significant clutter on the Checkout screen. Indeed, the Checkout screen presents several different items that undoubtedly distract from the indistinguishable TOU hyperlink—the customer's shipping address, drop-down box for shipping options, six (6) separate payment methods, payment entry fields, a coupon entry field, gift card prompts, marketing offers, payment and item summaries.

In sum, the hyperlinks on both the Fanatics' Account Creation and Checkout screens are not prominently displayed, nor distinct from the rest of the text on the respective screens in size or style and are ultimately lost on the crowded Checkout screen. As such, Fanatics' hyperlinks are far from constituting "reasonable notice" of Defendants' TOU and Arbitration Agreement within.

**a. Defendant's Hyperlink and Disclosure Are Not Reasonably Conspicuous**

The overwhelming weight of courts have found the presentation of hyperlinks and disclosures even more obvious than those employed by Fanatics to be insufficiently conspicuous to provide reasonable notice. *See e.g., Berman*, 30 F.4th at 857 (concluding small hyperlink terms in black text located near relevant buttons were not reasonably conspicuous because "[s]imply underscoring words or phrases…will often be insufficient to alert a reasonably prudent user that a clickable link exists); *Brooks,* 2022 WL 2079747, at * 6 (tiny grey hyperlink was "considerably deemphasized in relation to the other text on the webpage" and fell "woefully short" of constituting reasonable notice); *Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 480-81 (2021) (underlined hyperlinks were inconspicuous because they were "not set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters"); *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 865 (Cal. Ct. App. 2016) (finding capitalized and underlined hyperlinks to terms of use in light green font situated among other text in comparative font size and style on the checkout flow page were "simply too inconspicuous to meet [the reasonable notice] standard"); *Najah Edmundson v. Klarna, Inc.,* No. 3:21-CV-00758 (SVN), Dkt. No. 31, at p. 14-15 (D. Conn. February 15, 2022) (finding defendant's bolded, underlined, and black hyperlinks on its online payment screens were not clear and conspicuous enough to put a user on reasonable notice of the agreement where the text of the hyperlinks were the smallest text on the screen and ultimately, "there is nothing about the hyperlinks, or the text surrounding them, that would have drawn a user's attention to the links such that the user would be on inquiry notice of the terms in the agreements that were hyperlinked"); *Nicosia,* 834 F.3d at 237 (concluding the hyperlinked terms and disclaimer—"By placing your order, you agree to Amazon.com's…conditions of use"—was "not bold, capitalized, or conspicuous in light of the whole webpage" and therefore, did not constitute reasonable notice and foreclosed assent); *Theodore v. Uber Technologies, Inc.*, 442 F. Supp. 3d 433, 440-42 (D. Mass. 2020) (although hyperlink to company's terms

appeared in blue text against white background, it was not conspicuous enough to place the consumer on inquiry notice where some of the other terms on the page were the same color as the link); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 56, 62-63 (1st Cir. 2018) (concluding reference to "Terms of Service & Privacy Policy" displayed in bold, larger font in contrasting white print against black background and highlighted by a box surrounding it was not reasonably conspicuous); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 458, 466-67 (S.D.N.Y. 2017) (holding small-print hyperlink in blue font against white background was insufficient to constitute reasonable notice); *Wilson v. Redbox Automated Retail, LLC,* 448 F. Supp. 3d 873, 885 (N.D. Ill. 2020) (grey text hyperlink against black background was insufficient contrast and thus, not reasonably conspicuous); *Berkson v. Gogo LLC,* 97 F. Supp. 3d 359, 373-75, 404 (E.D.N.Y. 2015) (holding that the hyperlinked statements "By clicking 'Sign in' I agree to the *terms of use* and *privacy* policy," and "By clicking 'NEXT" I agree to the *terms of* use and *privacy* policy," which appeared in lowercase and small font located above "SIGN IN" and "NEXT" buttons on the sign-in and account creation pages, respectively, were inconspicuous because the terms were not "readily and obviously available" to plaintiff, the hyperlink was not in large font, all caps, or in bold, and the consumer was not required to scroll through those terms).

The very recent *Berman* decision is dispositive. *See Berman*, 30 F.4th 849 (analyzing an online contract under both California and New York law). In *Berman*, the Ninth Circuit affirmed the court's order which denied the defendant's motion to compel arbitration on the grounds that the terms to which plaintiffs would be bound were not "reasonably conspicuous" on defendant's website:

> The text disclosing the existence of the terms and conditions on the websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font that is barely legible to the naked eye. The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text. Far from meeting the requirement that a webpage must take steps "to capture the user's attention and secure her assent," the design and content of these webpages draw the user's attention away from the most important part of the page.

*Id.* at 856-57 (citations omitted). Screenshots of the relevant portions of the sign-in screens at issue in *Berman* are incorporated below:


Samples & Savings
TERMS | PRIVACY POLICY
Welcome back, stephanie!
Confirm your ZIP Code Below:
93930
I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy
I AGREE
to receive daily emails from SamplesandSavings and SweepstakesAlerts
This is correct, Continue! »
Getting Free Stuff Has Never Been Easier!
JOIN US!
Sign up and join our community of millions of users just like you on the prowl for samples, coupons, and freebies!
EXPLORE!
We will not only match you with products you are most interested, but you'll also be able to browse all samples we have available at the time.
SAVE BIG!
Let us provide you with freebies, trials, and samples that you'd typically be spending hard earned money on.




*See id.*, at Appendix A and B.

Similarly, here, the Fanatics' hyperlinks are printed in a tiny font that is substantially smaller than the rest of the text on the screens, and the textual notice is deemphasized in comparison to the overall design of the checkout screen, such that a user's attention is likely to be drawn elsewhere. Further, the hyperlinks on the Account Creation page are particularly problematic because they are not in a contrasting color or in all caps—a fact that certainly forecloses conspicuity. Indeed, as the *Berman* Court cautioned:

> A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. Consumers cannot be required to hover their mouse over otherwise plain-looking text or

> aimlessly click on words on a page in an effort to 'ferret out hyperlinks.' The failure to clearly denote the hyperlinks here fails our conspicuousness test.

*Id.* at 857 (internal citations omitted). Fanatics' hyperlinks on the Account Creation screen suffer the same defects. *See also Sellers*, 73 Cal. App. 5th at 483 (finding '<u>Terms of Service</u>' hyperlink insufficiently conspicuous because it failed to use all capital letters or a contrasting font color); *see id.* at 454-55 (relevant screenshots incorporated below):






Just like the hyperlinks that the California Court of Appeal found to be insufficient in *Sellers*, Defendant's hyperlinks, even though they are underlined, are ultimately inconspicuous because they are not in all capital letters, nor in significantly contrasting font color or emphasis to set them apart from the rest of the text on the webpage.

The level of clutter on Fanatics' Checkout screen is like that reviewed in *Nicosia*, which the Court found to be "sufficiently distracting so as to temper whatever effect the notification has." 834 F.3d at 237. To illustrate, the Order Page in *Nicosia* contained "numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message" regarding Amazon's terms:




*Id.* at 241, Appendix B.

In holding that the page failed to confer reasonably conspicuous notice, the Court noted that there "appear[ed] to be between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements." *Id.* at 237. Similarly, here, Fanatics' Checkout screen was crowded with so much extraneous information, such as advertisements and promotions, payment options, and fillable fields, that no reasonable user could be expected to realize that they are binding themselves to terms as a condition of their purchase.

Lastly, the *Berkson* decision is also persuasive, and screenshots of the relevant pages reviewed by the Eastern District Court of New York are inserted below:







*Berkson*, 97 F. Supp. 3d at 373-74. Like the "SIGN-IN" and "NEXT" buttons in *Berkson* above, Fanatics' "Create An Account" and "Place Order" / "Complete Order" buttons are substantially more vibrant in color against a white background and significantly larger and bolder than the hyperlink, distracting users from

the terms, which were in small, non-bolded, black font. Thus, "the importance of the [TOU] was obscured by the physical manifestation of assent, in this case clicking the [Place Order] button, expected of a consumer seeking to purchase" a product from Defendant's website. *Id.* at 404. Further, once Plaintiff clicked "Place Order," the TOU did not pop-up, nor was she required to scroll through the terms, nor hit "accept" or check a box that she agreed. *Id.*

Lastly, even if Fanatics' webpages sufficiently alerted Plaintiff to the hyperlink TOU, such disclosure would not provide reasonable notice of arbitration because it did not require Plaintiff to review or scroll through the TOU to complete his order, rather, it simply said "By placing an order, you *agree* to our Terms of Use & Privacy Policy" (emphasis added). *See* Flinchbaugh Decl., ¶ 11. *See Kauders*, 486 Mass. at 576, 579 (declining to enforce arbitration agreement where the online interface at registration which stated "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy" was not reasonable because it allowed the registration to be completed without reviewing or even acknowledging the terms and conditions, thereby causing a user to "reasonably believe he or she is simply signing up for a service without understanding that he or she is entering into a significant contractual relationship governed by wide-ranging terms of use"); *see also Sgouros v. Transunion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("[W]e cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.). Indeed, a person using the Internet may not realize that she is agreeing to a contract at all[.]").

In this regard, Fanatics' online contract is most akin to a browsewrap agreement, which are routinely held to be unenforceable in this Circuit for failing to provide inquiry notice. *See Berman,* 30 F.4th at 856 (identifying "browsewrap agreements" as those where "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website" and noting "[c]ourts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms."); *see e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).

Therefore, Fanatics' hyperlinks are deemphasized in comparison to the overall design of the webpages, were significantly inconspicuous, and overall, not notably distinct from the rest of the text on the relevant screens.

**b. Defendant's Cases Are Inapposite**

Because Fanatics' Account Creation and Checkout screens fail to present the hyperlinked TOU with the requisite level of clarity and conspicuousness, Defendant's authorities are misplaced. In both unpublished Ninth Circuit decisions—*Dohrmann v. Intuit, Inc.*, 823 Fed. Appx. 482, 484 (9th Cir. 2020) and *Lee v. Ticketmaster L.L.C.*, 817 Fed. Appx. 393, 395 (9th Cir. 2020)—the hyperlinks were found to be conspicuous enough where they were visually highlighted by the bright blue text, which was a different color than the rest of the text on the screens. This differs from Fanatics' hyperlink on the Account Creation screen, which was not distinguishable by any means, in font color or size, from the rest of the surrounding text on the screen. Further, the hyperlink in *Dohrmann* was italicized on a "relatively uncluttered" sign-in screen, whereas Fanatics' hyperlink on its Checkout screen was indistinguishable and otherwise hidden amongst the cluttered webpage. *Dohrmann,* 823 Fed. Appx. at 484. Similarly, the hyperlinks in *Peter v. DoorDash, Inc.* were in blue and underlined, unlike the hyperlink on Defendant's Account Creation screen, and appeared on an "uncluttered" webpage, unlike Fanatics' Checkout screen. Lastly, the *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) decision is distinguishable where the "general design of the webpage, which is comprised of only two data fields, is relatively uncluttered and has a muted, and essentially uniform, color scheme." In contrast, Fanatics' Checkout screen is significantly cluttered with various colors and items, such as the customer's shipping address, shipping options, six (6) separate payment methods, payment entry fields, a coupon entry field, gift card prompts, marketing offers, payment and item summaries.

**2. Publishing the TOU to the Fanatics' Website Does Not Constitute Reasonable Notice**

Defendant attests that the TOU "were also accessible to any user browsing any page of the Website through a hyperlink that appeared at the bottom of every page." Flinchbaugh Decl., ¶ 15. To the extent Fanatics suggests that purportedly posting its TOU to its website constitutes notice of its Arbitration Agreement, Defendant offers zero evidence to prove that this purported method of notice could ever suffice

for "reasonable" notice. Indeed, Defendant submits no evidentiary support to illustrate what its website looked like other than providing the Checkout flow screens, which fail to display Fanatics' hyperlink TOU. In any event, merely posting hyperlinked terms to a bottom of a general webpage do not meet the reasonable notice standard. *See Nguyen*, 763 F.3d at 1178-79 ("[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.").

### 3. Plaintiff Did Not Assent to the Terms of the Arbitration Agreement By Continuing to Make Purchases on Fanatics' Website

Because Fanatics failed to reasonably communicate the existence of the TOU and Arbitration Agreement,, Plaintiff could not have assented thereto. *See Berman*, 30 F.4th at 857; *see e.g., Cullinane*, 893 F.3d at 64 ("Because Plaintiffs were not reasonably notified of the terms of the Agreement, they did not provide their unambiguous assent to those terms."); *Kauders*, 486 Mass. at 579 (finding no reasonable manifestation of assent where the court already "conclude[d] that there was not reasonable notice of the terms, a contract cannot have been formed here."). This is true regardless of Plaintiff's additional purchases made on Fanatics' website. Indeed, in the absence of adequate inquiry notice of the existence of an agreement to arbitrate, courts have declined to find plaintiff's passive use of the service constitutes manifest assent to the terms of such provision. *See e.g., Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 128-29 (2d Cir. 2012) (declining to conclude plaintiffs' continued credit card payments alone constituted "a subjective understanding of the existence of the arbitration…provisions and an intent to be bound by them in exchange for the continued benefit."). Therefore, Defendant's argument that Plaintiff assented to arbitration each time he made a purchase on Fanatics' website fails because he was never put on notice of those terms in the first place.

## B. <u>Equitable Estoppel Principles Do Not Apply</u>

Defendant additionally argues that Plaintiff's claims are subject to arbitration by way of California's doctrine of equitable estoppel. But as an initial matter, the doctrine is inapplicable. Equitable estoppel is "peculiarly applicable to cases in which a nonsignatory to an arbitration agreement either seeks to compel arbitration of a claim against itself brought by a signatory party to the arbitration agreement, or

asserts a claim against such a signatory, who then seeks to compel the nonsignatory to arbitrate that claim." *Application of Equitable Estoppel to Compel Arbitration By or Against Nonsignatory—State Cases*, 22 A.L.R. 6th 387 (2007); *see also Stafford v. Rite Aid Corporation*, 998 F.3d 862, 866 (9th Cir. 2021) ("The touchstone for equitable estoppel is whether a ***nonsignatory*** is relying on an agreement for one purpose while disavowing the arbitration clause of the agreement.") (internal quotation marks and citations omitted) (emphasis added); *Franklin v. Community Regional Medical Center*, 2019 WL 6701298, at *4 (E.D. Cal. Dec. 9, 2019) ("Where a nonsignatory seeks to enforce an arbitration clause under California law, the doctrine of equitable estoppel applies in two circumstances. First, a nonsignatory may invoke equitable estoppel when the plaintiff's claims are intimately founded in and intertwined with the underlying contract obligations…[and] [s]econd, a nonsignatory may invoke equitable estoppel when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement") (internal quotation marks and citations omitted).

Indeed, each case cited by Defendant involved situations where non-signatories to a contract attempted to compel arbitration against signatories, or vice versa. *See e.g., Bucher v. All. Title Co., Inc.*, 127 Cal. App. 4th 262 (2005) ("Stated differently, defendant, a nonsignatory to the arbitration agreement, sought to compel plaintiff, a signatory, to arbitrate his claims against it."); *Stiner v. Brookdale Senior Living, Inc.*, 810 Fed. Appx. 531, 534 (9th Cir. 2020) (Quinlan's son did not have apparent authority to bind Quinlan to the residency agreement" and was therefore, a nonsignatory to the residency agreement); *JSM Tuscany, LLC v. Super. Ct.*, 193 Cal. App. 4th 1222, 1241 (Cal. Ct. App. 2011) (holding "[a] nonsignatory plaintiff can be compelled to arbitrate a claim even against a nonsignatory defendant, when the claim is itself based on, or inextricably intertwined with, the contract containing the arbitration clause"); *Montoya v. Comcast Corp.* 2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) (holding nonsignatory plaintiff was bound to the obligations of the contract, including the arbitration provision). And the *Carwile v. Samsung Telecommunications America, LLC*, 2013 WL 11030374 (C.D. Cal. July 9, 2013) case did not even involve the doctrine of equitable estoppel, but rather, a challenge to the agreement to arbitrate in breach of warranty case.

Here, Defendant's equitable estoppel argument fails because, plainly, there are no "non-signatories" at issue in this case. Instead, Plaintiff disputes that he is bound by Fanatics' TOU at all. *See Nguyen*, 763 F.3d at 1179-80 (upholding the lower court's rejection of defendant's estoppel argument in enforcing arbitration in browsewrap agreement because "Nguyen is not the type of non-signatory contemplated by the rule. Equitable estoppel typically applies to third parties who benefit from an agreement made between two primary parties[,]" and "Nguyen is not a third-party beneficiary to Barnes & Nobel's Terms of Use, and whether he is a primary party to the Terms of Use lies at the heart of this dispute.").

Moreover, Defendant fundamentally misunderstands Plaintiff's claims. Plaintiff alleges the Parties contracted for shipping at a certain price, and Defendant breached that contract by charging more than the agreed-upon price for shipping. Plaintiff's claims in no way depend on the existence or non-existence of the fine-print terms of service. Put differently, a contract existed between the Parties to ship merchandise at a certain price, irrespective of whether the terms of service are binding or not. Thus, Plaintiff's Complaint in no way concedes the enforceability of the fine print.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Fanatics' Motion to Compel Arbitration and Stay Action be denied in its entirety.

Dated: November 3, 2022

Respectfully submitted,

KALIELGOLD PLLC

By:________________________________
Jeffrey D. Kaliel
Sophia G. Gold

Attorneys for Plaintiff and the Proposed Class