1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   JAKE CAVANAUGH, on behalf of          No. 1:22-cv-01085 JLT SAB
     himself and all others similarly situated,
12                                          ORDER GRANTING DEFENDANT'S
                    Plaintiff,              MOTION TO COMPEL ARBITRATION
13                                          AND STAY ACTION
           v.
14                                          (Doc. 11)
     FANATICS, LLC,
15
                    Defendants.
16

17         Jake Cavanaugh asserts in this putative class action that Fanatics uses "deceptive and

18   untruthful promises to provide 'free' or flat, low-cost shipping on orders of sports merchandise

19   ordered through its website" but "surreptitiously adds a so-called 'Handling Fee' of $1.99 to all

20   orders." (Doc 1-1 at ¶¶ 1–2.) On behalf of himself and others similarly situated, he seeks to hold

21   Fanatics liable for violation of California's Unfair Competition Law (*id*. at 11), violation of the

22   Consumers Legal Remedies Act (*id*. at 13), and breach of contract (*id*. at 14), and seeks

23   damages, as well as "injunctive relief that fairly allows consumers to decide whether they will

24   pay Fanatics' shipping costs." (*Id*. at ¶ 10.) Fanatics seeks to compel arbitration pursuant its

25   website's terms of use and to stay the action. (Doc. 11.) Cavanaugh opposes Fanatics' motion

26   and asserts that he never agreed to Fanatics' terms of use or an arbitration agreement. (*See* Doc.

27   20.) For the reasons explained below, the motion is **GRANTED and the case is STAYED.**

28   ///

                                      1

1    **I.      Applicable Legal Standards**

2          The Federal Arbitration Act applies to arbitration agreements in any contract affecting

3    interstate commerce and "governs the allocation of authority between courts and arbitrators."

4    *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008); 9 U.S.C. § 2. The FAA

5    provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save

6    upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

7    This provision "create[s] a body of federal substantive law of arbitrability applicable to any

8    arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury*

9    *Constr. Corp.*, 460 U.S. 1, 24 (1983). A party seeking to enforce an arbitration agreement may

10   petition the Court for "an order directing the parties to proceed to arbitration in accordance with

11   the terms of the agreement." 9 U.S.C. § 4.

12         Because arbitration is a creation of contract, a court may compel arbitration only when

13   there is a "clear agreement" to arbitrate between the parties. *Davis v. Nordstrom, Inc.*, 755 F.3d

14   1089, 1092–93 (9th Cir. 2014) (citations omitted). "When determining whether a valid contract

15   to arbitrate exists, we apply ordinary state law principles that govern contract formation." *Id.* at

16   1093 (citing *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)). "If

17   the court finds a valid arbitration agreement exists, the court must order the parties to proceed to

18   arbitration in accordance with the terms of the agreement." *Keebaugh v. Warner Bros. Ent. Inc.*,

19   100 F.4th 1005, 1013 (9th Cir. 2024) (internal citation and quotation omitted).

20         Gateway issues such as validity and arbitrability may be delegated to the arbitrator.

21   *Bennett v. Anheuser-Busch Commercial Statefy, LLC,* No. 2:22-CV-01239-MCE-KJN, 2024 WL

22   1241916, at *4 (E.D. Cal. Mar. 22, 2024). "[A]ny doubts concerning the scope of arbitrable

23   issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24–25. As a result,

24   arbitration should only be denied when "it may be said with positive assurance that the

25   arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T*

26   *Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

27         It is well-established that "arbitration provides a forum for resolving disputes more

28   expeditiously and with greater flexibility than litigation." *Lifescan, Inc. v. Premier Diabetic*

1   *Servs., Inc.*, 363 F.3d 1010, 1011 (9th Cir. 2004). However, the presumption in favor of

2   arbitration applies only when determining the scope of arbitrable *issues* but not which *parties*

3   agreed to arbitrate. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013); *see*

4   *also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (holding the

5   presumption for arbitration "reverses" when determining whether certain parties are subject to

6   arbitration in cases of "silence or ambiguity"). "Courts should not assume that the parties agreed

7   to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."

8   *Kaplan*, 514 U.S. at 939.

9       In evaluating a motion to compel arbitration, the district court must apply the summary

10  judgment standard outlined in Federal Rule of Civil Procedure 56. *See Knapke v.*

11  *PeopleConnect, Inc.*, 38 F.4th 824, 831 (9th Cir. 2022); *Hansen v. LMB Mortg. Servs., Inc.*, 1

12  F.4th 667, 670 (9th Cir. 2021). "The summary judgment standard is appropriate because the

13  district court's order compelling arbitration is in effect a summary disposition of the issue of

14  whether or not there had been a meeting of the minds on the agreement to arbitrate." *Hansen*, 1

15  F.4th at 670 (internal quotation marks and citation omitted). "The court shall grant summary

16  judgment if the movant shows that there is no genuine dispute as to any material fact and the

17  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

18      Fanatics presents the declaration of Stephanie Flinchbaugh (Doc. 11-1), who serves as

19  Fanatics' Senior Director of Site Experience with responsibilities for websites owned or operated

20  by Fanatics and knowledge about the process by which a customer purchases an item or creates

21  an account on the Fanatics Website, and the Terms of Use applicable to purchases and account

22  creations. (*Id.* at ¶ 1.) Ms. Flinchbaugh provides various screenshots that depict the interactions

23  Cavanaugh had with Fanatics' website and the various ways that Fanatics' Terms of Use were

24  displayed as hyperlinks on those pages. (*See generally id.*).

25      Whether a hyperlink to a website's Terms of Use is sufficiently conspicuous under

26  California law is a pure question of law if the "material evidence consists exclusively of

27  screenshots from the Web site . . . and the authenticity of these screenshots is not subject to

28  factual dispute." *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863 (2016) (describing

1    this as a "pure question of law"); *see also Dohrmann v. Intuit, Inc*., 823 F. App'x 482, 483 (9th

2    Cir. 2020) (applying *de novo* standard of review because the conspicuousness of a hyperlink is a

3    pure question of law). Though Cavanaugh disputes whether he necessarily interacted with the

4    exact login/signup screen presented at paragraph 16 of Ms. Flinchbaugh's declaration (*see* Doc.

5    20 at 11), Cavanaugh does not dispute that he interacted several times with the checkout screen

6    depicted at Exhibit 1, page 2 of the Flinchbaugh Declaration (*id*. at 12), which the Court finds

7    dispositive.

8    **II.    Factual Background**

9         Cavanaugh created an account on Fanatics' website on June 6, 2019. (Doc. 11-1 ¶¶ 16–

10   17.) As depicted below, when a user creates an account on Fanatics' website, there is language

11   under the "Create An Account" button stating that "[b]y signing up, you agree to our Terms of

12   Use & Privacy Policy." (*Id*.)



27        Cavanaugh placed at least six purchases on the website between September 16, 2021 and

28   April 26, 2022. (Doc. 11-1 at ¶¶ 4-6.) When a customer places an order, they interact with a

checkout screen that is depicted in Appendix A to this decision. (Doc. 11-1, Ex. 1 at 3.) Through the first half of 2022, the "Place Order" button depicted in the checkout screenshot instead read "Complete Order," but was otherwise materially indistinguishable. A detailed version of that area of the screen is also provided by Ms. Flinchbaugh, as follows:



As shown, directly under the "Place Order" button, the website states that "[b]y placing an order, you agree to our Terms of Use & Privacy Policy." (Doc. 11-1, Ex. 1 at 10 (emphasis in original).) The underlined text, which appears to be in a font that is slightly smaller than some of the primary lettering on the page, is displayed in blue. (*Id*.)

Cavanaugh also enrolled in Fanatics' FanCash program, an optional loyalty discount program offered to customers with accounts. (Doc. 11-1 at ¶ 7.) It too is controlled by the website's Terms of Use. (*Id*.) Customers can use FanCash discount benefits and apply FanCash. (*Id*.) Cavanaugh received such discounts "on at least five separate purchases." (Doc. 11 at 18.)

This case specifically arises from Cavanaugh's purchase of branded sports apparel on the Fanatics' website on September 24, 2021. (Doc. 1 at ¶ 36.) Cavanaugh asserts that on that date he was "repeatedly informed that '[s]hipping' was FREE, including on the check-out screen." (*Id*. at ¶ 37.) Cavanaugh states that he was nonetheless charged a $1.99 handling fee and that he "would not have made the purchase if he had known the Fanatics shipping charge was not in fact FREE." (*Id*. at ¶¶ 38–40.)

Fanatics asserts that Cavanaugh agreed to the Terms of Use when he created his account and each time he placed an order, including the order he placed on September 24, 2021. (Doc. 11-1 at ¶ 4-6.) The Terms of Use begin by providing notice in all capital letters that an arbitration agreement is contained therein:

NOTICE REGARDING DISPUTE RESOLUTION . . . SECTION 22 CONTAINS AN ARBITRATION AGREEMENT AND WAIVER OF CLASS ACTION WHICH STATES THAT WE

MUST ARBITRATE INSTEAD OF GOING TO A COURT BEFORE A JUDGE AND JURY AND THAT ALL SUCH ARBITRATION CLAIMS MUST BE BROUGHT IN YOUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE OR MEMBER OR OTHERWISE ON BEHALF OF OTHERS IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING.

(Doc. 11-1, Ex. 2 at 1.) The arbitration agreement reads:

**PLEASE READ THIS SECTION CAREFULLY. IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT. Use or accessing the Properties or Offers constitutes your acceptance of this Arbitration provision.**

As a condition of using the Properties, you and we agree that any and all disputes, claims and causes of action (collectively, "Claims") arising out of or connected with the Properties (except for small claims court Claims, if applicable) shall be resolved exclusively by binding arbitration under the rules of the American Arbitration Association ("AAA"), including the Supplementary Procedures for Consumer-Related Disputes, for full and final settlement of such Claim applying the Federal Arbitration Act and other federal arbitration laws. YOU UNDERSTAND AND AGREE THAT YOU ARE WAIVING YOUR RIGHT TO SUE OR GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS UNDER THIS CONTRACT. YOU AND WE ALSO AGREE THAT (A) ANY CLAIMS WILL BE RESOLVED INDIVIDUALLY NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE, MEMBER OF OTHERWISE ON BEHALF OF OTHERS IN ANY PURPOSED CLASS, COLLECTIVE, OR REPRESENTATIVE PROCEEDING AND NOT THROUGH ANY CLASS ACTION, (B) IF A CLAIM PROCEEDS IN COURT ANYWAY, WE BOTH WAIVE ANY RIGHT TO A JURY TRIAL; AND (C) EITHER YOU OR WE MAY SEEK A COURT INJUNCTION REGARDING INTELLECTUAL PROPERTY INFRINGEMENT. ARBITRATION DOES NOT INVOLVE A JUDGE OR JURY. Although court review of an arbitration award may be limited, an arbitrator is empowered to award the same damages and relief as a court, including injunctive relief or statutory damages . . .

(Doc. 11-1, Ex. 2 at 8 (emphasis in original).)

### III.     Discussion

Fanatics seeks to compel arbitration because: 1.) Cavanaugh agreed to the Terms of Use, including the arbitration agreement, when he created his account and with each purchase he made (Doc. 11 at 17); 2.) Cavanaugh is estopped from disavowing arbitration because he is suing for breach of the same contract that contains the arbitration agreement (*id*. at 17–19); and 3.) all arbitrability questions regarding the scope or enforceability of the arbitration agreement

6

have been delegated to the arbitrator (*id*. at 19–20). Cavanaugh disputes that he agreed to the Terms of Use or the arbitration agreement and argues he was not provided sufficient notice of the arbitration agreement. (Doc. 20 at 9–26).

### A.    Contract Formation

To form a contract under California law, the parties must mutually assent to the terms of the agreement. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Parties manifest assent by written or spoken word but may also do so through their conduct. *Id*. The same principle applies to contracts created online. *Id*. at 855–56. An online contract is formed under California law where (1) "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound," and (2) "the consumer takes some action, such as clicking a button ... that unambiguously manifests his or her assent to those terms." *See Oberstein v. Live Nation Ent., Inc*., 60 F.4th 505, 515 (9th Cir. 2023); *see also Seneca v. Homeaglow, Inc*, No. 8:23-CV-02308-CJC-ADS, 2024 WL 750029, at *3 (C.D. Cal. Feb. 7, 2024). Here, the dispute focuses on the first element—conspicuousness of the notice of the relevant terms.

For purposes of applying these standards, online agreements have been roughly categorized in the caselaw. At one end of the spectrum are "scroll wrap" and "clickwrap agreements." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 470 (2021). Scroll wrap agreements require a user to scroll past the terms of the agreement and click on a button agreeing to said terms. *Id*. Clickwrap agreements require a user to check a box explicitly stating that they agree to the terms before proceeding. *Id*. Both scroll wrap and clickwrap agreements are generally enforced because the user received notice of the terms put forth and assented to those terms. *Id*.

At the other end of the spectrum are "browsewrap agreements." *Berman*, 30 F.4th at 856. Websites using these agreements disclose the terms of use in a hyperlink and indicate that users manifest assent by continuing to use the website. *Id*. Courts are more reluctant to enforce these agreements. *Id*.  Somewhere in the middle are "sign-in wrap" agreements. *Sellers*, 73 Cal. App. 5th at 471. Sign-in wrap agreements include a textual notice that a user will be bound by the

terms of use either by either creating or logging in to an account or by placing an order; however, the user is not required to review the terms and conditions or otherwise manifest their assent. *Id*.; *see also Silver v. Stripe Inc*., No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *8 (N.D. Cal. July 28, 2021) (designating as a "sign-in wrap" agreement terms and conditions disclosed above a checkout button). With this type of agreement, the user is "largely passive" and whether a contract exists turns on "whether a reasonable prudent offeree would be on inquiry notice of the terms at issue." *Sellers,* 73 Cal. App. 5th at 471.

<div align="center">1.   <u>Conspicuousness of Notice</u></div>

In considering whether a party seeking to compel arbitration has presented its terms and condition in a sufficiently conspicuous manner, courts consider criteria including: "(1) the size of the text; (2) the color of the text as compared to the background it appears against; (3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; (4) the obviousness of any associated hyperlink; and (5) whether other elements on the screen clutter or otherwise obscure the textual notice." *Sellers,* 73 Cal. App. 5th at 473. "Courts also consider the transactional context: i.e., whether consumers believe they are engaging in a one-off transaction, such a purchasing an article of clothing, or entering continuing relationship that would naturally require terms and conditions." *Seneca*, 2024 WL 750029 at *4 (citing *Sellers*, 73 Cal. App. 5th at 480–81).

<div align="center">*a)*   *Account Creation Screen*</div>

Fanatics asserts that Cavanaugh assented to the Terms of Use when he first created his Fanatics account and that he also assented each subsequent time he logged into the website. (Doc. 11 at 9–10.) Cavanaugh provided his name, email address, and a password when he created the account. (*Id*. at 10.) The words "By signing up, you agree to our <u>Terms of Use & Privacy Policy,</u>" in gray text, are directly under a red "Create An Account" button. (Doc. 11-1 at ¶ 17) The underlined words were hyperlinked to the full text of the Terms of Use and Privacy Policy. (*Id*.)

Cavanaugh asserts that the account creation screen failed to provide sufficient notice of the arbitration agreement because the "TOU hyperlink is in miniscule text size and in black, non-

<div align="center">8</div>

1    bolded font. The hyperlink and preceding disclaimer are not in all capital letters, nor are they in

2    any distinguishable font size or style to sufficiently set them apart from the rest of the text on the

3    screen." (Doc. 20 at 11.) Cavanaugh argues that the size and color of the "Create An Account"

4    button make it the focal point on the screen. (*Id*.) He maintains that as a result "any reasonable

5    consumer presented with this screen would easily overlook the inconspicuous hyperlink TOU."

6    (*Id*.)

7         Fanatics states that the notice "is easily readable and understandable" and cites *Heller v.*

8    *Rasier, LLC*, 2020 WL 413243, at *11 (C.D. Cal. Jan. 7, 2020), and *Hansen v. Ticketmaster*

9    *Entm't, Inc.*, No. 20-CV-02685-EMC, 2020 WL 7319358, at *4 (N.D. Cal. Dec. 11, 2020), as

10   examples where a court found something less conspicuous than the notice on the Fanatics

11   account creation page to provide reasonable notice.

12        In *Hansen*, plaintiff sued defendants for changing its refund policy following the

13   COVID-19 pandemic. 2020 WL 7319358, at *1. Plaintiff purchased concert tickets after logging

14   into his Ticketmaster account, which required him to provide his email address and password

15   and then click on a blue button with the words "Sign in" on it. *Id*. The following disclosure was

16   directly above the blue button in a "slightly smaller font size compared to other text:" "By

17   continuing past this page, you agree to the Terms of Use and understand that information will be

18   used as described in our Privacy Policy." *Id*. The statement was in gray, but the words "Terms of

19   Use" were blue, indicating that there was a hyperlink. *Id*. The *Hansen* court found that despite

20   the notice "being smaller than other text and [] being grey in color," the "proximity of the text to

21   the 'Sign in' button makes the text conspicuous" because "the text is not markedly smaller than

22   the other text, and the grey is in sufficient contrast to the background which is white." *Id*.

23        Though there are some similarities between the sign-up page in this case and the sign in

24   page in *Hansen*, there is a critical difference. The hyperlink in *Hansen* was in a contrasting color.

25   Here it is not. Numerous cases have found mere underlining of a hyperlink to be insufficient. In

26   *Berman*, for example, the Ninth Circuit, applying California law, held that "while it is

27   permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is

28   present must be readily apparent," and concluded that a "web designer must do more than simply

9

underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text." 30 F.4th at 857. The *Berman* court rejected as inconspicuous hyperlinks that were underlined but did not include other "customary" design elements for hyperlinks, such as "use of a contrasting . . . color" or "all capital letters," that would have alerted users that the text was clickable. *Id*. In contrast, hyperlinks that are presented in a contrasting color may be sufficiently conspicuous. *See Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024); *see also Massel v. SuccessfulMatch.com*, No. 23-CV-02389-PCP, 2024 WL 802194, at *5 (N.D. Cal. Feb. 27, 2024) ("Because Millionaire Match's links were underlined but did not appear in a contrasting color, the Court must conclude, under *Berman*, that they were not reasonably conspicuous enough. . . This conclusion is bolstered by the fact that other links on the signup page appear in all capital letters while the links to the Service Agreement and Privacy Policy are in title case. These distinctions may seem picayune, but website operators like Millionaire Match have ultimate control over their design decisions. Nothing requires them to present terms as subtle hyperlinks to separate pages instead of, say, requiring users to scroll through the actual terms before signing up."); *Lopez v. Dave Inc*., No. 22-CV-04160-VC, 2022 WL 17089824, at *2 (N.D. Cal. Nov. 21, 2022), *aff'd*, No. 22-16915, 2023 WL 8594393 (9th Cir. Dec. 12, 2023) (concluding hyperlinks were insufficient because, among other things, none of the design elements noted in *Berman* were present). In the absence of any evidence demonstrating that website design practices and public understanding of them have shifted, the Court will not depart from the overall trend that finds hyperlinks must be offset in a more obvious way than the underlining used on the Fanatics sign-up page at issue in this case.

<div align="center">

*b)*   *Complete Order/Place Order Screen*

</div>

Fanatics alternatively assets that Cavanaugh assented to the Terms of Use each subsequent time he completed a purchase. (Doc. 11 at 15.) Cavanaugh maintains that the checkout screen (*see* Appendix A) is problematic for the following reasons:

> Fanatics' TOU hyperlink is indistinguishable from the surrounding text on the page, as it is indisputably one of the smallest texts on the screen and in non-bolded font. The preceding disclaimer is similarly in miniscule, non-bolded, black font. The fact that the TOU hyperlink is blue in color ultimately fails to distinguish itself from

<div align="center">

10

</div>

the surrounding text, as there are several other items and text in varying colors across the screen, including the blue PayPal, Venmo, FanCash Rewards, and Visa logos, as well as the "Learn More" hyperlink. Further, the hyperlink and disclaimer are discreetly located almost at the very bottom of the screen and are otherwise lost amongst the significant clutter on the Checkout screen. Indeed, the Checkout screen presents several different items that undoubtedly distract from the indistinguishable TOU hyperlink— the customer's shipping address, drop-down box for shipping options, six (6) separate payment methods, payment entry fields, a coupon entry field, gift card prompts, marketing offers, payment and item summaries.

(Doc. 20 at 13.)

Two cases help frame this analysis. In *Silver*, another California district court found Instacart's checkout page sufficiently conspicuous because (a) the terms of service hyperlink on that page was in a bright color against a white background, which stood out from the surrounding text and (b) was located "close" to the place order button and thus was "hard for a user placing an order to miss," even though that disclosure was in a different column of the checkout screen and was in a relatively smaller font than other text on the screen. *Silver*, 2021 WL 3191752, at *3.[1]

Another arguably relevant example is presented in *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016), a case relied upon by Cavanaugh to argue the Fanatics checkout screen is too "cluttered." (*See* Doc. 20 at 10–11.) In *Nicosia*, the Second Circuit concluded that Amazon.com's conditions of use were not conspicuously disclosed because the text line in question, which read "By placing your order, you agree to Amazon.com's . . . conditions of use," was not bold, capitalized, or conspicuous in light of the whole webpage. *Id*. at 237.[2] In addition, there were "numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure[d] the message." *Id*. Altogether there were "between fifteen

---

[1] The version of the *Silver* decision available on Westlaw presents a somewhat blurry image of the relevant checkout screen. The Court has reviewed the clearer screenshot presented in the complaint in that case and attaches it as Appendix B.

[2] The checkout screens reviewed by the Second Circuit in *Nicosia* are presented in Appendix C. The first (Appendix C-1) was the primary image relied upon; the second (Appendix C-2) was an alternative version the plaintiff argued was the relevant page. The Second Circuit reasoned that the ruling would have been "essentially the same" for both versions. *Nicosia*, 834 F.3d at 234 n.4.

and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements. Further, the presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has." *Id.*

First, the Court notes that *Nicosia* was decided approximately eight years ago, distant history in the digital age, while the decision in *Silver* is much more recent. Second, visually, the Fanatics checkout screen Cavanaugh interacted with is closer to the one in *Silver* than to that in *Nicosia*. The Fanatics checkout screen is not unduly cluttered; rather, it simply contains all the information relevant to the potential purchase. The hyperlink disclosing Fanatics' Terms of Use is in slightly smaller font than some other elements on the page, but it is accented in blue which contrasts with the white background of the page. In addition, the hyperlink disclosure is presented immediately below the checkout button, not in an entirely separate section of the screen. There are not nearly as many hyperlinks as in *Nicosia* and fewer colors operating on the screen to obscure the message. Overall, the Court finds that the Fanatics checkout screen is not unduly cluttered and that the hyperlink to the Terms of Use is reasonably conspicuous.

### c)    Full Context of the Transaction

In evaluating the conspicuousness of a disclosure, a court should also consider the "full context of the transaction." *Sellers*, 73 Cal. App. 5th at 477. In *Sellers*, plaintiffs paid $5 to submit a question and were automatically enrolled in a recurring monthly membership. Finding plaintiffs were not provided sufficient notice of the recurring membership, the court considered the full context of plaintiffs' transactions:

> As discussed, a consumer on the JustAnswer website is not asked to "sign up" for an account but is instead invited to "Start my trial" and get the answer to a single question for a one-time fee of $5. This is not a situation in which "[t]he registration process clearly contemplated some sort of continuing relationship ... that would require some terms and conditions," nor is there any evidence the Plaintiffs were familiar with the service being offered. (*See Meyer, supra*, 868 F.3d at p. 80.) To the contrary, Plaintiffs were attempting to "[s]tart [a] trial" to determine whether they wanted to use the service at all and were not likely expecting that their "trial" would be governed by approximately 26 pages of contractual terms. Thus,

1

2

3

4

5

6

> just as they would not likely be looking for small print regarding enrollment in an automatically recurring membership, they also would not likely be scrutinizing the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms. (See *Long, supra*, 245 Cal.App.4th at pp. 866–867.)
>
> Absent such scrutiny, it is not likely a typical consumer would notice the relatively inconspicuous notice of contractual terms that would govern their use of the JustAnswer website.

7 *Sellers*, 73 Cal. App. 5th at 480.

8        The Ninth Circuit clarified that though the context of the transaction is a non-dispositive

9 factor used to evaluate whether a website's notice is sufficiently conspicuous, courts must still

10 evaluate the visual aspects of the notice under the two-part test we articulated in *Berman*.

11 *Keebaugh*, 100 F.4th at 1019. Ninth Circuit cases decided after *Sellers* grouped context together

12 with evaluation of the visual aspects of the notice, such as font size, text placement, and overall

13 screen design.

14

15

16

17

18

19

20

> In *Berman*, [the Ninth Circuit's] contextual analysis was limited to only the visual elements. 30 F.4th at 856 ("First, to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."). In *Oberstein*, [the Ninth Circuit] first analyzed the visual elements and separately advised that "in contrast with the noncommittal free trial offered in *Sellers*, the context of this transaction, requiring a full registration process, reflected the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." 60 F.4th at 517 (internal quotation omitted).

21 *Keebaugh*, 100 F.4th at 1019.

22        Fanatics asserts that Cavanaugh agreed to the Terms of Use and Privacy Policy by

23 creating his account, each time he logged in, and by placing his order. (Doc. 11 at 9-11.) In the

24 instant case, though there may be disputes over the exact screens Cavanaugh viewed when

25 signing up for an account (*see* Doc. 20 at 11–12), it is undisputed that Cavanaugh went through a

26 registration process to create an account with Fanatics. (Doc. 11-1 at ¶ 6.) It is also undisputed

27 that that Cavanaugh participated in Fanatics' FanCash Loyalty Program, which gives users three

28 percent credit on eligible purchases. (Doc. 11-1 at ¶ 7.) This indicates a continuing relationship.

1    Therefore, the context of Cavanaugh's purchases weighs in favor of finding sufficient notice.

2    Considering all the above, the Court concludes that the Terms of Use hyperlink on the

3    Fanatics checkout page Cavanaugh interacted with was sufficiently conspicuous.

4    <center>2.     Unambiguous Manifestation.</center>

5    The second question is whether Cavanaugh took some action that unambiguously

6    manifests assent. "A user's click of a button can be construed as an unambiguous manifestation

7    of assent only if the user is explicitly advised that the act of clicking will constitute assent to the

8    terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly

9    notify a user of the legal significance of the action she must take to enter into a contractual

10   agreement." *Id*. at 858. The Ninth Circuit has approved of text that informs the user that, by

11   clicking on this button, "you agree to our Terms of Use" or "[b]y continuing past this page, you

12   agree to the Terms of Use." *Oberstein*, 60 F.4th 505, 515–16. The language used here — "[b]y

13   placing an order, you agree to our Terms of Use & Privacy Policy"—located just below the

14   checkout button, is sufficient. It is undisputed that Cavanaugh clicked the checkout button. It is

15   likewise undisputed that the terms of use contained a binding arbitration provision.

16   Since the Court has found that Cavanaugh assented to arbitration on the checkout screen,

17   it need not reach the alternative arguments advanced by Fanatics.

18   **B.     Delegation of Arbitrability**

19   The Court now turns to whether the arbitration agreement covers the instant dispute.

20   Fanatics asserts that "disputes about scope and enforceability are for the arbitrator when 'the

21   parties have demonstrated, clearly and unmistakably that it is their intent to' delegate such

22   questions to the arbitrator." (Doc. 11 at 19.) Fanatics further asserts that the arbitration

23   agreement delegates scope and enforceability by 1) its broad language stating that "any and all

24   disputes, claims and causes of action…shall be resolved exclusively by binding arbitration," and

25   2) by specifying that the "arbitration will be administered under the rules of the American

26   Arbitration Association" which state that the "arbitrator shall have the power to rule on his or his

27   own jurisdiction, including any objections with respect to the existence, scope, or validity of the

28   arbitration agreement or to the arbitrability of any claim or counterclaim." (*Id*. at 20.)

<center>14</center>

1    In response, Cavanaugh conflates the issue of whether an arbitration agreement exists

2   with whether a delegation clause is enforceable by contending that "[t]here is a strong and long-

3   standing presumption that courts, not arbitrators, determine threshold questions of arbitrability,"

4   and that "delegation clauses will not be enforced when where [sic] the threshold challenge is

5   whether a valid agreement was ever formed between the parties in the first place." (Doc. 20 at

6   8.) Cavanaugh cites to *Brooks v. IT Works Mktg., Inc.*, No. 1-21-CV-01341 DAD BAK, 2022

7   WL 2079747, at *5 (E.D. Cal. June 9, 2022), for the latter proposition. (*Id.* at 8–9.) However,

8   *Brooks*, which indicates that only a court is empowered to determine whether a valid agreement

9   was formed, does not directly address Fanatics' assertion that the issue of <u>scope</u> may be

10   delegated to the arbitrator. Because the Court has already found that the parties formed a valid

11   agreement, the question now is whether there is a valid agreement to delegate the issue of scope

12   to the arbitrator.

13    Cavanaugh fails to meaningfully dispute the issue of delegation. As discussed above,

14   gateway issues, including scope, may be delegated to the arbitrator. *See Bennett*, 2024 WL

15   1241916 at *4. Here, the arbitration agreement incorporates the AAA's rules, which include a

16   broad delegation clause. (*See* Doc. 11-1 at 22.) The Ninth Circuit has already considered whether

17   a delegation clause is enforceable when it is incorporated via the AAA's rules. In *Brennan v.

18   Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015), the Ninth Circuit held that the same delegation

19   clause at issue here was not unconscionable and that "incorporation of the AAA rules constitutes

20   clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Id.*

21    Since these are the same rules in question, and Cavanaugh does not raise any arguments

22   to dispute the delegation clause's enforceability, the Court finds that the existence of the

23   delegation clause is sufficient evidence that the parties in the instant case intended to arbitrate

24   arbitrability and delegate the scope of the arbitration agreement to the arbitrator. The Court

25   acknowledges that the instant case differs from *Brennan* based on the nature of the contract and

26   the parties' sophistication, however, since Cavanaugh did not address these differences and the

27   *Brennan* court did not "foreclose the possibility that this rule could also apply to unsophisticated

28   parties or to consumer contracts," *Brennan*, 796 F.3d at 1130, the Court will treat the

15

applicability of *Brennan* as uncontested. Even if the issues of scope and enforceability had not been delegated to the arbitrator, Cavanaugh offers no substantive arguments (apart from the formation arguments rejected above) to suggest that the agreement is unenforceable or that the dispute presented here falls outside the agreement's scope.

### C.  Request to Stay the Action Pending Arbitration

Fanatics requests that the Court stay the action pending arbitration. (Doc. 11 at 21.) Cavanaugh argues that the entire motion should be dismissed and does not address Fanatics' request for a stay. (*See generally* Doc. 20.) The FAA requires that "on application of one of the parties [the Court] stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *Smith v. Spizzirri*, 144 S. Ct. 1173, 1175 (2024) (holding that a court is not permitted to dismiss if one party requests a stay pending arbitration). Therefore, the Court stays the instant action pending the arbitration proceedings.

## IV.   CONCLUSION

Having found that the parties formed a valid arbitration agreement and that the issue of scope was delegated to the arbitrator, the Court **GRANTS** Fanatics' motion to compel arbitration and **STAYS** the instant case pending completion of the arbitration process.

The parties are directed to submit a joint status report outlining the results of the arbitration and the need for further proceedings 90 days from the date of this order and every 90 days thereafter or within 30 days of the completion of arbitration, whichever is sooner.

IT IS SO ORDERED.

Dated:   **June 26, 2024**

UNITED STATES DISTRICT JUDGE

**Appendix A:**
**Fanatics Checkout Page from Doc. 11-1, Ex. 1, Page 12 of 32**



CART: $74.99   |   365 DAY RETURNS   FANCASH SEE WEEKLY DEALS

DEAL ENDS SOON!   48 HOURS ONLY!   FREE U.S. SHIPPING ON ORDERS OVER $49   *Exclusions Apply   USE CODE: 49SHIP

## Secure Checkout

**Shipping Address**

Sample Customer
1701 Market St
Philadelphia, PA 19103-2901 US

EDIT

**Payment**

○ PayPal
○ Google Pay
○ Venmo
○ FanCash Rewards Credit Card
  Learn More.

○ Zip - Pay In 4 Installments.
● Credit Card  VISA

**Billing Address**

☑ Same as shipping address

🔒 Place Order

By placing an order, you agree to our Terms of Use & Privacy Policy.

**Shipping**

Standard: 3-7 Business Days ($4.99)



Card Number*

Expiration Month*          Expiration Year*

Security Code*

**Have a Coupon?**   −

Coupon (Limit 1)
49SHIP                    Apply

**Apply Gift Card Number**   +

🚚 GET FREE SHIPPING on your order! Use Code: 49SHIP

Subtotal                          $74.99
Standard: 3-7 Business Days       $4.99
Handling ⓘ                        $1.99
Tax                               $0.56

Total                            $82.53
Includes shipping & handling

FanCash earned                    $2.25

**Items (1)**

Eli Manning New York Giants Nike Youth Game Jersey - White
$74.99

SIZE YTH L    QUANTITY 1

This item will ship within 1 business day.

🛍 **SHOPRUNNER** offers free 2-day shipping & free returns on items in your cart ($59 minimum)
learn more | sign in

**Appendix B:**
Instacart Checkout Page from *Silver v. Stripe, Inc.*, No. 4:20-cv-08196-YGR (C.D. Cal.),
Document 47, Filed 05/11/21 Page 10 of 61.





**Appendix C-1:**
**Amazon.com Checkout Screen**
**from *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, Addendum B (2d Cir. 2016)**



**Appendix C-1:**
**Amazon.com Checkout Screen**
**from *Nicosia*, 834 F.3d 220, Addendum C**

